Submitted July 9, 2019, affirmed March 18, 2020

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**SCOTT LEANDER CAMIRAND,**
aka Scott Camirand,
*Defendant-Appellant.*

Lincoln County Circuit Court
17CR37531, 17CR24691;
A165966 (Control), A165967

463 P3d 46

Defendant appeals from a judgment of conviction for coercion and robbery in the third degree. He asserts, among other contentions, that the trial court erred by (1) allowing the prosecutor to argue facts not introduced into evidence about why a substance found on defendant's gloves had not been DNA tested as blood; and (2) by refusing to give the witness-false-in-part jury instruction. *Held*: Defendant failed to demonstrate that he was prejudiced by either asserted error. Although the trial court should have sustained defendant's objection to the prosecutor's improper closing argument, there was little likelihood that the argument affected the jury's determination about whether the substance on the gloves was, in fact, blood. And, given the limited value that the witness-false-in-part instruction provides, and the fact that defendant challenged the credibility of the state's witnesses during his closing argument, any error in failing to give that instruction was harmless.

Affirmed.

Thomas O. Branford, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Sarah Laidlaw, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and David B. Thompson, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

DeVORE, J.

Affirmed.

James, J., dissenting.

**DeVORE, J.**

Defendant appeals from a judgment of conviction for coercion and robbery in the third degree. Defendant asserts five assignments of error, two of which he preserved below and the rest of which he asks us to review for plain error. We reject the unpreserved challenges without discussion.[1] With regard to the preserved challenges, defendant first argues that the trial court erred by allowing the prosecutor, during rebuttal, to argue facts not introduced into evidence. Next, defendant argues that the trial court erred by refusing to give the "witness-false-in-part" jury instruction. We reject those two preserved challenges as harmless. Accordingly, we affirm.

Because our analysis of the two preserved assignments of error turns on the issue of harmlessness, we consider the nature of the asserted errors in the context of the trial as a whole. *See State v. Lachat*, 298 Or App 579, 582, 448 P3d 670 (2019) (explaining that approach). We therefore describe the parties' theories of the case and the manner in which evidence was offered and argued to the jury.

The state brought defendant to trial on charges of coercion and third-degree robbery. In his opening statement, the prosecutor explained that the state's investigation began when Officer Randall found CM walking down the street with blood on his face. Randall knew CM, who was homeless, from previous contacts, and Randall asked what had happened. CM had stated that he had been beaten up by defendant after an argument about a text message supposedly sent to CM's ex-girlfriend, and that defendant made CM give him CM's cell phone and three one-dollar bills. The prosecutor explained that CM told the officer that defendant

---

[1] One of those assignments, advanced in a supplemental brief, argues that the trial court erred under the Sixth and Fourteenth Amendments to the United States Constitution by instructing the jury that it could return a verdict of guilty without the unanimous agreement of the jurors. He argues that the United States Supreme Court's decision to grant *certiorari* in *Ramos v. Louisiana*, ___ US ___, 139 S Ct 1318, 203 L Ed 2d 563 (2019), signals the Court's intention to overrule its prior decision in *Apodaca v. Oregon*, 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972). Unless and until that happens, *Apodaca* remains good law, and we reject defendant's argument. *See, e.g.*, *State v. Bowen*, 215 Or App 199, 202, 168 P3d 1208 (2007), *adh'd to as modified on recons*, 220 Or App 380, 185 P3d 1129, *rev den*, 345 Or 415 (2008), *cert den*, 558 US 815 (2009).

hit him several times in the face, and that the jury would see photographic evidence of the injuries and hear from JB, who witnessed the incident.

The prosecutor noted the presence of blood on gloves that defendant was wearing when he was later arrested. He stated, "In the process of doing this, like the OJ case, there was a pair of gloves involved that [defendant] was wearing, whenever he did this." He told the jury that

> "Officer Randall's going to testify that he found [defendant] wearing the gloves described by [CM], and that he went up to talk to him. As he was speaking, he sees the gloves. He also notices there's some blood on the gloves, and so the gloves are taken into custody, and [defendant] is placed under arrest. He's been searched incident to arrest, and you can imagine what they found in the search. Three one dollar bills and a cellphone that belonged to [CM]. Ladies and gentlemen, that's robbery."

The state called three witnesses at trial. CM, the state's first witness, testified that, on the evening of June 8, 2017, he and JB were on a church porch attempting to sleep when defendant approached and began to shout, claiming that CM had sent a text message to CM's girlfriend threatening to kill their baby. CM testified that, when he denied defendant's accusation, defendant attacked him, punching him three times in the head and kicking him in the jaw, resulting in several lesions on his face. CM said that defendant told him to hand over his cell phone, money, and cigarettes, and that he gave defendant his black ZTE cell phone, three one-dollar bills, and a pack of cigarettes, which defendant took before leaving.

CM testified that, after defendant left, he and JB "started looking around and [saw] blood all over my sleeping bag, blood all over me. You know, I—I realized how bloody I really was until then." He and JB then got up and walked to a nearby parking garage, where they were approached by Officer Randall on patrol, who asked CM what had happened. CM testified that he told Randall that he had been assaulted by defendant, and Randall took pictures of him. CM said that he had "[j]ust a bloody nose" but later found out that it was broken.

The prosecutor asked CM about the phone that had been taken during the assault. CM said that it was a ZTE phone that he had had for about a month or month and a half. The prosecutor then had the following exchange with CM:

"Q:   Show you what I've marked as State's exhibit one. Do you recognize that?

"A:   I do.

"Q:   Is that your cellphone?

"A:   It is.

"Q:   How—how are you sure? There's probably hundreds of those.

"A:   Because it's the one [defendant] took. I can't honestly say that without turning it on, I can't honestly say that I can look at it and say it's mine.

"Q:   Okay, and so you view that—that phone, and is that the exact type of phone that you had with you?

"Yes."

On cross-examination, defendant elicited testimony about CM's description of the attacker. CM testified that he had known defendant from around the church, and that he told Randall that defendant was wearing blue gloves, jeans, and a gray hoodie on the night of the attack. Then, on redirect, CM testified that he had known defendant for a few months before the incident and knew that it was defendant because "I could see him and I know who he is." CM said that he had given a description to Randall that defendant was "[m]y height, my build, full beard, mustache, black hair," and he then identified defendant, sitting at counsel table, as the attacker.

The state's second witness, JB, testified that he and CM are friends, and that he "was sleeping and I got woke up with [defendant] on top of [CM] punching his lights out." JB described the attack and that he heard defendant reference something about CM's girlfriend and hurting his baby. But, on direct examination, JB had difficulty identifying defendant in the courtroom. JB stated that he would recognize defendant if he saw him, but that defendant—who was

seated at counsel table—was not in the courtroom. After explaining, "I'm blind," JB proceeded to discuss what he saw and heard during the attack. JB testified that defendant said, "give me, anything you have of value, give it to me now, and then he stopped, and he said no, no. I want you to hand it to me," and that CM did so.

The state's final witness was Randall. He testified that he was on patrol when he found CM and noticed "quite a bit of blood on his face." Randall said that he asked CM for his side of the story, which JB affirmed. Randall then ran defendant's name through a database and retrieved his DMV photo. After seeing the photo, both CM and JB confirmed that defendant was the attacker, and they told Randall that defendant was "probably still at the St. Steven's Church." Randall went to that location and arrested defendant.

Randall testified that defendant was wearing "athletic style gloves" when he arrested him. During a search incident to the arrest, Randall found $3 "in the same pocket as his wallet but not inside of his wallet," and a black ZTE cell phone in defendant's back pocket. Randall testified that, as he was handcuffing defendant, he "noticed what appeared to be some dry blood on them." The gloves themselves were then admitted as an exhibit, and Randall pointed out for the jury what he believed to be blood on them.

Randall was wearing a body camera during that encounter, and that video was played for the jury. During the video, Randall and another officer refer to blood on the gloves, and one of the officers asks the other to photograph the blood. After the video was played, the prosecutor asked, "It looked like you were looking for more blood on [defendant]. Did you find any?" Randall responded, "I did not."

During defendant's cross-examination, Randall testified that CM had not described defendant as having a full beard and that, in fact, footage from his body camera reflected that defendant did not have a full beard at that time. Randall also acknowledged that the gloves seized from defendant were not blue as described by CM, that he did not see blood all over CM, and that it seemed like JB had "had something to drink" the night of the incident.

Defendant also elicited testimony on cross-examination about Randall's investigation of the cell phone. Randall acknowledged that CM had shown him a box for a ZTE phone, but Randall did not seize the box or compare the serial number on the box with the number on the phone taken from defendant; Randall also acknowledged the phone seized from defendant had been "locked" and its contents were not investigated by police.

After Randall testified, the state rested its case and defendant did not put on any evidence. The parties then proceeded to closing arguments, where the prosecutor began by acknowledging that JB's testimony was not helpful to the state—the "one hiccup that we get in this case. He did indicate that he has trouble seeing, and he's—as he's walking in that is fairly noticeable." After telling the jurors that he had given them "everything that—that we're allowed to have the jury see, whether it be for us, against us," the prosecutor turned to his theory of the case:

> "In every case attorneys are taught that there should be a theory of the case that should have been the thing that something centers around, and the greatest one that it has ever been done, was by Johnny Cochran in the OJ trial. (Indiscernable) if the glove don't fit you must acquit. So the theory in this case is the gloves do fit. You must convict."

He then asserted that the only part of the state's case that could be called into question was JB's inability to identify defendant in the courtroom, which he attributed to defendant's changed appearance (growing a beard) since the incident and JB's poor eyesight.

Defendant's closing argument challenged, among other things, the strength of the state's evidence of identification. With regard to the phone, defendant argued that the officers had the cell phone in their possession for months, knew who supposedly could unlock it, but never tried to open the phone or check the serial number against CM's cell phone box; moreover, he argued, CM was not even sure that the phone was his. As for the money in his pocket, defendant argued that "there's nothing identifiable" about a person having a few loose dollar bills in a pocket outside a wallet. Defendant then turned to the gloves:

"Now the gloves. First of all, I don't think you actually heard [CM] saying that there were gloves being worn, but these are apparently the gloves that if they don't—or if they do fit you must convict, right? Okay. These gloves, these blood stains supposedly. We didn't hear that they'd been identified specifically as blood—blood stains. There's a couple little marks matching up with these injuries. Did these gloves have anything to do with this face?

"You also heard that of the description provided they were the wrong color. You got some green gloves here. That's not what was described. Now again we're talking about people who are homeless, so staying out in the middle of the night in Lincoln County. You heard from the officer it was a bit chilly. Does it mean anything that you are wearing gloves? Or does it mean that it was chilly outside?

"And again I really want you to look closely when you get the opportunity at the supposed blood, hasn't been identified as blood, nobody tested it as blood, and the small amount of whatever that is on these gloves that was caused by beating up [CM]."

In rebuttal, the prosecutor attempted to address those asserted weaknesses in the state's proof. He argued:

"[Defendant] did compel [CM] to hand over his property, but he wasn't going to leave. [CM] didn't want to take more of a beating. Now admitted the follow up in this case was a little lacking, so with that, this could have been kind of looked into. The State will advise you that shortly after this Officer Randall went and got married and had a honeymoon right after this incident occurred. He was gone for a while so the follow up was a little bit slow on this case.

"However, let's talk about DNA evidence. So I mentioned to you earlier we talked about the CSI effect that you can get DNA in an hour. In the case that we have right now, in the cases we have going right now, it's taking four to six months."

At that point defendant stated, "Objection, arguing facts not in evidence." The court responded, "It's up to the jury to recall what the testimony was so I'm going to overrule the objection. It's strictly up to you what your recollection of the evidence is."

The prosecutor then continued the same line of argument:

> "So this occurred a little over two months ago. The State has no ability to get DNA in that short of period of time whenever a jury trial was requested, so the DNA cannot happen that quick. And so we're arguing that—that is blood. Football gloves or baseball gloves that are being worn, and you get to take them back into the room, and you get to see the blood stains that are on these gloves. Apparently from hitting [CM]."

After closing arguments, the court instructed the jury, including that, "[i]n reaching your verdict you should consider only the evidence that is received and these instructions. I trust that the attorneys opening statements and closing arguments have been helpful to you, but remember if your recollection of the evidence differs from that of the attorneys, rely on your own recollection unless and until you can convince [*sic*] that your recollection is not accurate."

While deliberating, the jury sent a question to the court asking whether the phone could be turned on and unlocked. The court told the jury that it could attempt to turn on the phone, but that the battery was likely dead and that the charger was not in evidence. The jury then deliberated further and ultimately returned a guilty verdict on the charges.

On appeal, defendant argues that the trial court erred as a matter of law by allowing the prosecutor to argue facts not in evidence. We agree. After defendant's closing argument that "the supposed blood" had not been "identified as blood, nobody tested it as blood," it was permissible for the prosecutor, on rebuttal, to tell the jury that it could find that the substance was blood based on the evidence presented, without any DNA testing. *See, e.g.*, *State v. Spieler*, 269 Or App 623, 642, 346 P3d 549, 560 (2015) ("[I]f defense counsel invites the factfinder to consider nonadmitted evidence as undermining the state's case, the prosecutor is entitled to respond, again, so long as that response comports with the proper allocation of the burden of proof."); *Accord Pickett v. State*, 222 Md App 322, 337, 112 A3d 1078, 1087 (2015) (Holding that the prosecutor's argument did not "insinuate

that appellant's DNA and fingerprint were found on the iPhone case. Rather, it was merely a response to appellant's counsel's argument regarding forensic evidence, asserting that the lack of DNA evidence and fingerprints was irrelevant, a 'red herring.'"). That is, there was nothing objectionable about the prosecutor telling the jury that it would have the opportunity to take the gloves "back into the room, and you get to see the blood stains that are on these gloves," and to tell the jury that the state was nevertheless arguing that the substance was blood even without DNA testing.

But the prosecutor did not limit his argument to that type of permissible rebuttal. The prosecutor also provided an explanation for the state's lack of DNA testing, stating that "it's taking four to six months" to get DNA tests back and that the state had "no ability to get DNA in that short of period of time whenever a jury trial was requested, so the DNA cannot happen that quick." That was error, and the state correctly concedes the point. *See Cler v. Providence Health System-Oregon*, 349 Or 481, 490, 245 P3d 642 (2010) ("In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." (Internal quotation marks and citation omitted.)).

The only question is whether that error prejudiced defendant. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?").[2] According to defendant, "[t]he state lacked physical evidence connecting defendant to the crimes," and it "used the facts not in evidence to persuade the jury to overlook its deficient proof that the marks on defendant's gloves were CM's blood." That is, "[t]he state invited the jury to forgive the state for failing to properly investigate a crime and, in so doing, convict

---

[2] Although defendant contends that the prosecutor's argument violated his right to due process under the federal constitution, his objection did not preserve that issue; nor has he demonstrated that the prosecutor's comments resulted in a fundamentally unfair trial. We therefore review harmlessness solely as a matter of state law.

defendant of the crime based on something less than sufficient evidence presented at the trial." In response, the state argues that "the issue of whether there was blood on defendant's gloves (the officer testified only that it looked like blood) was relatively unimportant" and the "prosecutor's improper reference to facts not in evidence during closing argument did not materially prejudice defendant."

The record, as recited above, does not support the state's characterization of the presence of blood on defendant's gloves as "relatively unimportant" to its case. In the state's opening and closing arguments, the existence of blood on the gloves was a point of emphasis by the prosecutor and was one of the facts tying defendant to the crime, along with other circumstantial evidence and eyewitness testimony. It was not merely cumulative of other circumstantial evidence that defendant committed the robbery, such as the phone, location, and dollar bills, and defendant challenged the significance of that other evidence and the reliability of the eyewitness accounts of the assault—one of whom could not identify defendant in court. The presence of blood on the gloves was a fact of consequence in the case and part of the prosecutor's "central" theme, contrary to the state's contention on appeal.

Nonetheless, we conclude that the prosecutor's improper closing argument had little likelihood of affecting the jury's determination as to whether the substance on the gloves was, in fact, blood. The prosecutor fully acknowledged that the substance on the gloves had not been tested, and nothing in his argument suggested what the outcome of such tests might be. Rather, he improperly introduced facts on *why* such testing had not occurred.

On this particular record, it is unlikely that the jury was influenced or distracted by the prosecutor's introduction of facts bearing on why the testing had not occurred. The jury was instructed, both at the outset of the trial and after closing arguments, that it was to decide the case based on the evidence presented, and that the parties' arguments are not evidence. And, even though the court erroneously overruled defendant's objection, it nevertheless gave a similar cautionary instruction at that time, stating, "It's up to

the jury to recall what the testimony was so I'm going to overrule the objection. It's strictly up to you what your recollection of the evidence is."

In light of the repeated instructions to follow the evidence—and the fact that there was no dispute about what "evidence" was in the record with regard to the substance on the gloves—there is no reason to believe that the jury decided whether the substance was blood based on anything other than its own assessment of the gloves themselves (an exhibit in the case), the officer's testimony about the substance, and the video evidence presented at trial. In sum, the prosecutor's explanation for the lack of DNA testing, although improper, was not likely to have influenced the verdict, and the court's error in overruling the objection provides no basis for reversal.[3]

Defendant's remaining challenge concerns the trial court's refusal to give the "witness-false-in-part" jury instruction. Unlike most jury instructions, the "witness-false-in-part" instruction exists as a part of a statute, ORS 10.095(3).[4] That statute requires the instruction to be given on all "proper occasion[s]," which occur when "there has been sufficient evidence for the jury to decide that at least one witness consciously testified falsely." *Ireland v. Mitchell*, 226 Or 286, 293, 359 P2d 894 (1961). Minor inconsistencies in a witness's testimony will generally not be sufficient to support giving the instruction. *See id*. at 295. Instead, there must be evidence supporting an inference of intentional deceit by the witness. *Id.*

---

[3] Although defendant's assignment of error primarily relies on the prosecutor's introduction of facts about DNA evidence, he also references the prosecutor's statements that follow-up on the case was "a bit slow" because "Officer Randall went and got married and had a honeymoon right after this incident occurred." It is debatable whether defendant preserved a claim of error based on those statements, considering that he did not object until the prosecutor's later statements about DNA evidence. In any event, we are not persuaded that, in the context of the case as a whole, that fleeting reference to the officer's marriage and honeymoon, although also improper, had the potential to influence the jury's verdict.

[4] In relevant part, ORS 10.095 provides that:

"[The jury is] to be instructed by the court on all proper occasions:

"* * * * *

"(3)   That a witness false in one part of the testimony of the witness may be distrusted in others[.]"

Defendant contends that there was sufficient evidence for the jury to infer that either CM or JB consciously testified falsely. He cites inconsistencies between CM's and JB's testimony and Randall's testimony about statements they made regarding whether CM's attacker kicked him or not and regarding the precise words that the attacker used when demanding valuables from CM. He also contends that CM's description of his attacker's facial hair and clothing color did not match defendant's appearance when he was arrested. Finally, he notes that JB was unable to identify him as CM's attacker at trial, despite identifying him to Randall.

After reviewing the record, we conclude that there is no need for us to decide whether the evidence would provide a basis for the jury to infer that CM or JB consciously testified falsely. Even if the evidence does provide such a basis, any error in failing to give the instruction was harmless as there is little likelihood it affected the jury's verdict. *See State v. Ashkins*, 357 Or 642, 660, 357 P3d 490 (2015) (giving the standard for harmless error and applying harmless error analysis to a court's failure to give a jury instruction).

We have previously explained that the "witness-false-in-part" instruction should be "approached with caution." *State v. Walker*, 291 Or App 188, 193, 419 P3d 794 (2018). Giving the instruction risks inviting the jury to speculate that the court believes one of the witnesses was untruthful. *Ireland*, 226 Or at 292-93. The instruction adds very little to the case as it does not require anything new of the jury. *State v. Payne*, 298 Or App 438, 442, 447 P3d 71, *rev allowed*, 365 Or 556 (2019). Instead, the instruction "merely restates common sense" and only "tells the jury what it is already free to do." *Id.* at 441-42. Even without the instruction, we have observed, parties can get the same effect by arguing during closing that a witness's testimony was not credible. *Id.* at 442. Here, defendant did just that.

Defendant spent almost half of his closing argument challenging the credibility of the state's witnesses. Given the instruction's scant value to the jury and that defendant challenged the credibility of the state's witnesses during his closing argument, we conclude that, even assuming, without

deciding, that the instruction was appropriate, there is little likelihood that the failure to give it would have affected the verdict. Any error in failing to give the instruction was harmless.

Affirmed.

**JAMES, J.,** dissenting.

The prosecutor in this case began his closing arguments to the jury by saying that in "every trial I've ever done I wanted to make something up. That's not allowed. We're not allowed to do that." He then went and did exactly that. In a case involving an allegedly bloody glove—a case the prosecutor himself likened to "the OJ case," going so far as to argue "[T]he gloves do fit. You must convict"—the prosecutor rightly must have perceived that the defense had scored a valuable point in closing argument when defense counsel pointed out that the glove, although described as "bloody" by witnesses, had never actually been tested by a lab for blood.

We have said, numerous times, that scientific evidence carries heightened persuasive power with a jury. *See, e.g.*, *State v. Branch*, 243 Or App 309, 315, 259 P3d 103, *rev den*, 351 Or 216 (2011) (noting that evidence which "draws its convincing force from a scientific principle * * * would be more persuasive to the trier of fact due to its scientific nature"). The impact of scientific evidence has been universally noted by courts in all jurisdictions. Consequently, the absence of scientific evidence, where it might reasonably be expected by a jury, is not only a proper, but a potentially powerful, line of argument for a litigant. *See, e.g.*, *Sample v. State*, 314 Md 202, 207, 209, 550 A2d 661, 663, 664 (1988) (When "the State has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence").

Like any experienced trial advocate who understands the power of closing arguments, the prosecutor here apparently determined that some response was necessary to assuage the jury. He invented facts not in evidence, then argued that nonevidence as mitigation to counter defense

counsel's point. First, the prosecutor played to the sympathies of the jury by telling them that a failure to test for blood was due, in part, to the fact that the investigating officer had just married and "had a honeymoon right after this incident occurred. He was gone for a while so the follow up was a little bit slow on this case." Then, the prosecutor took the premise that underlies defense counsel's point—that the state's failure to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity can contribute to reasonable doubt—and labeled it the "CSI effect" and invented evidence to support the argument that any such expectations are unreasonable and unrealistic by saying "that you can get DNA in an hour *** in the cases we have going right now, it's taking four to six months."

Neither the majority, nor I, conclude that the prosecutor's actions here were anything other than improper. The state itself conceded that point on appeal. In a criminal case, where the stakes are someone's liberty, the prosecutor invited the jury to base its decision, in part, on fictional evidence. And the record supports the conclusion that he did so deliberately, and with the purpose of gaining a tactical advantage.[1] Ultimately, however, the majority holds that any such error was harmless under Oregon's constitutional test for affirmance despite error, which requires us

---

[1] I do not imply, however, that the prosecutor did so maliciously. I do not believe that to be the case. On this record, he appears to have been caught up in the passion of advocacy. His error here is entirely human and understandable, but no less error. For prosecutors are not merely advocates. A "prosecutor's role as a representative of the state is not just to convict a criminal defendant, but to seek justice in every case." *State v. Harrell/Wilson*, 353 Or 247, 261, 297 P3d 461 (2013). They hold a place of power in our justice system and accordingly are governed by stringent standards. As the United States Supreme Court stated:

"The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger v. United States*, 295 US 78, 88, 55 S Ct 629, 633, 79 L Ed 1314 (1935).

to conclude that there was little likelihood that the particular error affected the verdict. *See State v. Davis*, 336 Or 19, 27-28, 77 P3d 1111 (2003). I cannot confidently arrive at that result.

The majority's interpretation and application of Oregon law on harmless error expands this court's flawed jurisprudential approach to assessing the harm of prosecutorial misconduct in closing. We should be applying a methodology that more fully appreciates the reality of the impact of misconduct in closing, while remaining consistent to our constitutional mandate under Article VII (Amended), section 3, of the Oregon Constitution to affirm a judgment "notwithstanding any error committed during the trial" when such error is determined to be harmless.

First, closing arguments are powerful. Their very purpose is to persuade. *United States v. Jones*, 194 F3d 1178, 1181 (10th Cir 1999), *judgment vac'd*, 530 US 1271, 120 S Ct 2739, 147 L Ed 2d 1002 (2000) ("[P]ersuasive summation of the facts admitted into evidence is the very purpose of closing argument.") As one court aptly noted:

> "The power of closing argument in a criminal case cannot be overstated, especially when the jury's verdict turns on limited circumstantial evidence. A skilled prosecutor may weave that evidence into a tight narrative that virtually demands a finding of guilt. A similarly skilled defense lawyer, however, may point out gaps in the evidence suggestive of reasonable doubt and, thus, an obligation to render a not guilty verdict. The foundation of our adversarial system of adjudication depends upon that sort of clash of advocates testing the evidence in a given case, thereby guiding lay jurors to a 'true' verdict."

*State v. Payne*, No 119083, 2019 WL 4551642 at *1 (Kan Ct App, Sept 20, 2019).

Second, closing arguments by the representative of the state are especially powerful, being an expression of the views of the government which carries with it implications of authority, knowledge, and trust:

> "The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him, with a minimum of

words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty."

*Cardona v. State*, 185 So 3d 514, 520 (Fla 2016) (citation omitted). Scholars have cautioned that the weight a prosecutor's words carry in closing arguments should be properly appreciated by appellate courts in the context of harmless error:

> "Even when courts label these statements as improper, however, they often treat these statements as harmless error. In doing so, courts underestimate the power of these statements. Research consistently shows that jurors inherently find prosecutors to be more credible than defense counsel."

Mary Nicol Bowman, *Mitigating Foul Blows*, 49 Ga L Rev 309, 322-23 (2015).

Third, rebuttal closing is even more powerful still. On rebuttal, there is no opportunity for opposing counsel to respond, and such comments are imbued with the power of recency in the minds of the jury. The persuasive effects of recency have been known since the sophists and are now confirmed with empirical psychological research. This research shows that people tend to remember best, and be influenced most, by the latest event in a sequence more than by earlier events, making rebuttal the most persuasive aspect of closing arguments. *See, e.g.*, Ryan Patrick Alford, *Catalyzing More Adequate Federal Habeas Review of Summation Misconduct: Persuasion Theory and the Sixth Amendment Right to an Unbiased Jury*, 59 Okla L Rev 479, 518 (2006). "[H]uman experience validates this psychological concept." Larry S. Pozner and Roger J. Dodd, *Cross-Examination: Science and Techniques* 501 (2d ed 2004). "There is no one among us who does not want to have the last word in an argument." Michael D. Cicchini, *Prosecutorial Misconduct at Trial: A New Perspective Rooted in Confrontation Clause Jurisprudence*, 37 Seton Hall L Rev 335, 341 (2007).

Unaddressed misconduct in closing argument carries serious systemic implications for the perceived fairness

of our judicial system. As commentators have noted, when a court finds error, but fails to correct it, we risk "tacitly inform[ing] prosecutors that they can weigh the commission of evidentiary or procedural violations not against a legal or ethical standard of appropriate conduct, but rather, against an increasingly accurate prediction that the appellate courts will ignore the misconduct * * *." Bennett L. Gershman, *The New Prosecutors*, 53 U Pitt L Rev 393, 425 (1992). The risk, of course, is that when we hold harmless what began as entirely nonmalicious conduct, as in this case, we tie our hands from correcting similar conduct in the future done maliciously. "This system creates little incentive for prosecutors to change their behavior and avoid making improper comments because future prosecutors committing the same impropriety in a later case that was held to be misconduct in an earlier one are no more likely than the prosecutor in the first case to see any meaningful consequences from the misconduct." Bowman, 49 Ga L Rev at 352. Those systemic concerns, however, cannot override our constitutional obligation to assess harm in each case.

An approach to harmless error in individual cases—one that is mindful of the systemic consequences of inaction, while remaining true to our obligations under the constitution—begins with a recognition that appellate courts are poorly suited to the task of assessing juror impact. The task of a reviewing court, years after the trial has completed, to transport itself back and assess the mindset of twelve citizens whom that reviewing court has never met is not an easy one. The reality of such an assessment has been widely criticized, as one scholar noted:

> "Like the reader left to ponder what would happen if one could travel back in time, a jurist or commentator can only expound on what might have happened at a trial if things had gone differently, if the trial had actually been carried out free of error. As a result, the conclusions obtained can be no better than science fiction. We can argue about these conclusions-about whether a jury would have convicted the defendant without reference to the prohibited evidence-but the conclusions we come to are no more satisfying than those we arrive at when arguing over the plot of a good novel."

Sam Kamin, *Harmless Error and the Rights/Remedies Split*, 88 Va L Rev 1, 21 (2002).

An appellate assessment of harmless error in this area can be honest about our limitations by giving appropriate weight to the reasoned tactical decisions of trial counsel. The women and men who appear in circuit courts daily throughout Oregon on criminal matters, both for the prosecution and the defense, are some of the most skilled trial attorneys in the nation. By the end of their first year, a new prosecutor or defense lawyer will have conducted countless jury trials. Within only a few years they will be as seasoned at reading a jury and crafting a persuasive argument as the most senior attorney in another practice area. These women and men know their jobs and are very good at them. When they make a choice to pursue a line of argument to a jury it is not on a whim or a hunch, it is because extensive experience has taught them that such argument is necessary and effective.

In assessing harmless error in closing arguments, we should begin with the presumption that, typically, trial counsel made the argument for a tactical reason. As discussed above, that is the case here. Further, we should be mindful that it was trial counsel, not an appellate court, who stood in the well of the court that day and looked into the eyes of 12 jurors and, based on trial experience and learned skills in jury persuasion, made the strategic decision *that that particular statement* was what was necessary to move the jury.

When a reviewing court declares misconduct in closing argument harmless, that court is, in effect, saying that the tactical decision of trial counsel to make that argument to persuade the jury was unreasonable, as it had little likelihood of affecting the jury. At least in other contexts—in particular on issues of preservation and claims of plain error—Oregon courts are generally hesitant to displace the reasonable tactical decision of counsel. *See, e.g.*, *Stevens v. State of Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995) ("[A]n appellate court usually will not second-guess the tactical decisions of a lawyer in the course of representing a

criminal defendant."). That hesitancy should apply equally in the assessment of harm in closing arguments.

Here, the prosecutor made an argument in rebuttal closing that he reasonably believed would affect the jury. There is nothing in this record that convinces me that *my* assessment of the persuasive power of *that* argument, to *that* particular jury, is superior to *his*. His reasoned tactical decision to make that argument to persuade jury is powerful evidence that it, in fact, was reasonably likely to affect the jury. Based on this record then, I cannot conclude that the error had little likelihood of affecting the verdict.

I respectfully dissent.