Submitted on remand from the Oregon Supreme Court August 9, reversed and remanded September 29, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SCOTT LEANDER CAMIRAND,
aka Scott Camirand,
*Defendant-Appellant.*

Lincoln County Circuit Court
17CR37531, 17CR24691;
A165966 (Control), A165967

499 P3d 154

The Court of Appeals initially affirmed defendant's convictions after concluding that the trial court's error in allowing the prosecutor to argue facts not in evidence was harmless, as was any error in failing to give the "witness-false-in-part" jury instruction. The Supreme Court vacated that decision and remanded it for reconsideration in light of the Supreme Court's subsequent decisions in *State v. Payne*, 366 Or 588, 468 P3d 445 (2020), and *State v. Banks*, 367 Or 574, 481 P3d 1275 (2021). *Held*: On reconsideration in light of *Banks*, the prosecutor's improper argument had some likelihood of affecting the jury's verdict and, therefore, the court's error in overruling defendant's objection to it was not harmless.

Reversed and remanded.

On remand from the Oregon Supreme Court, *State v. Camirand*, 368 Or 347, 489 P3d 540 (2021).

Thomas O. Branford, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Sarah Laidlaw, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and David B. Thompson, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

LAGESEN, P. J.

Reversed and remanded.

**LAGESEN, P. J.**

This case is before us on remand for reconsideration of our decision in *State v. Camirand*, 303 Or App 1, 463 P3d 46 (2020) (*Camirand I*), *vac'd and rem'd*, 368 Or 347, 489 P3d 540 (2021) (*Camirand II*). Our decision in *Camirand I* addressed two preserved claims of error, one concerning prosecutorial misconduct during closing argument, and the other concerning the court's refusal to give the "witness-false-in-part" instruction.[1] 303 Or App at 2. On the first, we agreed with defendant that the trial court erred by allowing the prosecutor, during rebuttal, to argue facts not introduced into evidence, but we concluded that the error was harmless. *Id.* at 9-11. On the second, we assumed, without deciding, that defendant was entitled to the witness-false-in-part jury instruction but determined that that error, too, was harmless. *Id.* at 11-13. Our harmless error analysis with regard to the instruction was premised on the conclusion we reached in *State v. Payne*, 298 Or App 438, 442, 447 P3d 71 (2019) (*Payne I*), that the witness-false-in-part instruction adds little to the case and merely tells the jury what it already knows.

As it turned out, the Supreme Court disagreed with our approach in *Payne I* and reversed that decision, concluding that the failure to give the witness-false-in-part instruction is significant and that the failure to give it was prejudicial in that case. *State v. Payne*, 366 Or 588, 468 P3d 445 (2020) (*Payne II*). Then, while the petition for review was pending in this case, the Supreme Court decided *State v. Banks*, 367 Or 574, 481 P3d 1275 (2021), a case that, like *Camirand I*, involved a prosecutor's reference to facts not in evidence. The court concluded that the prosecutorial misconduct in *Banks* was prejudicial and required reversal.

Thereafter, the Supreme Court vacated our decision in *Camirand I* and remanded for us to reconsider our

---

[1] We also rejected various unpreserved assignments of error, including one about the court's failure to instruct the jury that its verdict must be unanimous. *Camirand I*, 303 Or App at 2 & n 1. None of those unpreserved assignments are at issue on remand, but we note that the verdicts in this case were unanimous. *See State v. Flores Ramos*, 367 Or 292, 294, 478 P3d 515 (2020) (rejecting a claim that instructional error regarding jury unanimity was structural error that required reversal of unanimous verdicts).

decision in light of *Payne II* and *Banks*. As explained below, we conclude that, in light of *Banks*, our original decision did not fully account for the type of prejudice that results from a prosecutor's introduction of facts outside the record, and that the prosecutor's error in this case was not harmless after all. In light of our reversal, we do not address the applicability of the witness-false-in-part instruction, which, if it arises at all on remand, will arise on a different record.

Our decision in *Camirand I* described the background of the charges and the events at trial, and it is not necessary to repeat that recitation fully. In short, defendant was brought to trial on charges of coercion and third-degree robbery after two individuals, CM and JB, identified him as the person who had assaulted and bloodied CM and then forced CM to surrender a cell phone and three one-dollar bills. The state called three witnesses at trial: CM, JB, and Randall, the police officer to whom CM and JB reported the crimes and who later arrested defendant nearby. One of the pieces of evidence tying defendant to the assault—and on which the prosecutor built much of his theme of the case—was the presence of a substance on the gloves that defendant was wearing when he was arrested, a substance the prosecutor characterized as blood from the assault of CM. As we recounted in *Camirand I*, the prosecutor argued during closing:

> "'In every case attorneys are taught that there should be a theory of the case that should have been the thing that something centers around, and the greatest one that it has ever been done, was by Johnny Cochran in the OJ trial. (Indiscernable) if the glove don't fit you must acquit. So the theory in this case is the gloves do fit. You must convict.'"

303 Or App at 6.

Defendant responded by challenging the strength of the state's evidence of identification. Addressing the gloves, he highlighted the state's failure to test whatever substance was on the gloves:

> "'Now the gloves. First of all, I don't think you actually heard [CM] saying that there were gloves being worn, but these are apparently the gloves that if they don't—or if they do fit you must convict, right? Okay. These gloves, these

blood stains supposedly. We didn't hear that they'd been identified specifically as blood—blood stains. There's a couple little marks matching up with these injuries. Did these gloves have anything to do with this face?'

"'You also heard that of the description provided they were the wrong color. You got some green gloves here. That's not what was described. Now again we're talking about people who are homeless, so staying out in the middle of the night in Lincoln County. You heard from the officer it was a bit chilly. Does it mean anything that you are wearing gloves? Or, does it mean that it was chilly outside?'

"'And again I really want you to look closely when you get the opportunity at the supposed blood, hasn't been identified as blood, *nobody tested it as blood, and the small amount of whatever that is on these gloves that was caused by beating up [CM].*'"

*Id.* at 7 (emphasis added).

To respond to that argument and counter defendant's assertions that the failure to test the substance on the gloves gave rise to a reason to doubt the state's case, the prosecutor, in rebuttal, introduced facts outside the record:

"[PROSECUTOR]: '[Defendant] did compel [CM] to hand over his property, but he wasn't going to leave. [CM] didn't want to take more of a beating. Now admitted the follow up in this case was a little lacking, so with that, this could have been kind of looked into. The State will advise you that shortly after this Officer Randall went and got married and had a honeymoon right after this incident occurred. He was gone for a while so the follow up was a little bit slow on this case.'

"'However, let's talk about DNA evidence. So I mentioned to you earlier we talked about the CSI effect that you can get DNA in an hour. In the case that we have right now, in the cases we have going right now, it's taking four to six months.'"

*Id.*

Defendant objected on the ground that the state was arguing facts that were not in evidence, to which the court responded: "It's up to the jury to recall what the testimony was so I'm going to overrule the objection. It's strictly up to

you what your recollection of the evidence is." Thereafter, the prosecutor continued the same line of argument to explain away its lack of DNA evidence:

> "'So this occurred a little over two months ago. The State has no ability to get DNA in that short of period of time whenever a jury trial was requested, so the DNA cannot happen that quick. And so we're arguing that—that is blood. Football gloves or baseball gloves that are being worn, and you get to take them back into the room, and you get to see the blood stains that are on these gloves. Apparently from hitting [CM].'"

*Id.* at 8.

After those closing arguments, when the trial court instructed the jury, it included a general instruction that,

> "'[i]n reaching your verdict you should consider only the evidence that is received and these instructions. I trust that the attorneys' opening statements and closing arguments have been helpful to you, but remember if your recollection of the evidence differs from that of the attorneys, rely on your own recollection unless and until you can convince [*sic*] that your recollection is not accurate.'"

*Id.* The evidence that the jury had with it during deliberations included the gloves themselves. The jury ultimately returned unanimous verdicts on the charges.

On appeal, we agreed with defendant that the prosecutor's explanation for the state's lack of DNA testing—that "it's taking four to six months" to get DNA tests back and that the state had "no ability to get DNA in that short of period of time whenever a jury trial was requested, so the DNA cannot happen that quick"—impermissibly introduced facts that were not in the record, which was error. *Id.* at 9. Further, we disagreed with the state's contention that the presence of blood on the gloves was "relatively unimportant":

> "In the state's opening and closing arguments, the existence of blood on the gloves was a point of emphasis by the prosecutor and was one of the facts tying defendant to the crime, along with other circumstantial evidence and eyewitness testimony. It was not merely cumulative of other circumstantial evidence that defendant committed the robbery, such as the phone, location, and dollar bills, and defendant

challenged the significance of that other evidence and the reliability of the eyewitness accounts of the assault—one of whom could not identify defendant in court. *The presence of blood on the gloves was a fact of consequence in the case and part of the prosecutor's 'central' theme, contrary to the state's contention on appeal.*"

*Id.* at 10 (emphasis added).

We nevertheless concluded that the prosecutor's introduction of facts about DNA testing was not likely to have affected the jury's verdict. We reached that conclusion primarily based on the facts that (1) the jury was able to inspect the gloves firsthand to evaluate whether the substance on them was blood; (2) the record contained other evidence indicating that the gloves were bloody; and (3) the trial court's instructions to the jury informed it that arguments were not evidence, and that the jury was to base its decision on its own assessment of the evidence:

"[W]e conclude that the prosecutor's improper closing argument had little likelihood of affecting the jury's determination as to whether the substance on the gloves was, in fact, blood. The prosecutor fully acknowledged that the substance on the gloves had not been tested, and nothing in his argument suggested what the outcome of such tests might be. Rather, he improperly introduced facts on *why* such testing had not occurred.

"On this particular record, it is unlikely that the jury was influenced or distracted by the prosecutor's introduction of facts bearing on why the testing had not occurred. The jury was instructed, both at the outset of the trial and after closing arguments, that it was to decide the case based on the evidence presented, and that the parties' arguments are not evidence. And, even though the court erroneously overruled defendant's objection, it nevertheless gave a similar cautionary instruction at that time, stating, 'It's up to the jury to recall what the testimony was so I'm going to overrule the objection. It's strictly up to you what your recollection of the evidence is.'

"In light of the repeated instructions to follow the evidence—and the fact that there was no dispute about what 'evidence' was in the record with regard to the substance on the gloves—there is no reason to believe that the jury decided whether the substance was blood based on

anything other than its own assessment of the gloves them-
selves (an exhibit in the case), the officer's testimony about
the substance, and the video evidence presented at trial. In
sum, the prosecutor's explanation for the lack of DNA test-
ing, although improper, was not likely to have influenced
the verdict, and the court's error in overruling the objection
provides no basis for reversal."

*Id.* at 10-11 (emphasis in original).

We also noted that, "[a]lthough defendant's assign-
ment of error primarily relies on the prosecutor's introduc-
tion of facts about DNA evidence, he also references the
prosecutor's statements that follow-up on the case was 'a bit
slow' because 'Officer Randall went and got married and
had a honeymoon right after this incident occurred.'" *Id.* at
11 n 3. We stated that it was debatable that a claim of error
based on those statements had been preserved, but we went
on to explain that, "in the context of the case as a whole, that
fleeting reference to the officer's marriage and honeymoon,
although also improper," did not have the potential to influ-
ence the jury's verdict. Accordingly, we rejected defendant's
contention that the court had committed reversible error by
allowing the prosecutor to argue facts not in evidence. *Id.* at
11.[2]

After we issued *Camirand I*, the Supreme Court
decided *Banks*, a case presenting a similar issue of prose-
cutorial misconduct through reference to facts outside the
record. In *Banks*, the state had charged the defendant with
harassment based on an incident at a mobile phone store.
367 Or at 576. Pretrial, the state had provided the defen-
dant with security video from the store, but the video did not
reflect the alleged harassment. *Id.* During *voir dire*, the pros-
ecutor told prospective jurors that "'the rules of evidence'"
limited what she could present to the jury, that "'some things
are not going to come into the trial today,'" and that the jury
was "'not going to have all the facts.'" *Id.* The defendant
objected, arguing that the prosecutor's statements implied

---

[2] Judge James dissented from that conclusion. He would have concluded
that "the prosecutor made an argument in rebuttal closing that he reasonably
believed would affect the jury," and that the prosecutor's "reasoned tactical deci-
sion to make that argument to persuade the jury is powerful evidence that it, in
fact, was reasonably likely to affect the jury." *Id.* at 19 (James, J., dissenting).

"'that there's more video, but for some reason that video didn't get to come in by the rules of evidence.'" *Id.* at 578-79. The trial court denied the defendant's request to instruct the jury that it should not assume that "'the rules of evidence have precluded any evidence at this point.'" *Id.* at 580. The court denied defense counsel's request. *Id.*

In the course of the trial, defense counsel argued that the store had three security cameras and that the state had failed to produce video showing the alleged harassment. *Id.* at 576. During deliberations, the jury sent a question to the court asking whether the prosecutor knew if there was video evidence of the alleged harassment and, if so, whether the prosecutor was required to show it at trial. *Id.* The court told the jury that it had been provided the evidence that had been admitted and that it was "'unable to provide further response.'" *Id.* The jury found the defendant guilty, and we affirmed the judgment without opinion. *Id.* (describing that procedural posture).

Before the Supreme Court, the state argued that the prosecutor's statements were not improper for three reasons: (1) they were made during *voir dire*, not during trial; (2) "the statements did not suggest that 'the state possessed *incriminating* evidence,' just inadmissible evidence"; and (3) the prosecutor told the jury "that it was 'not allowed to speculate.'" *Id.* 587 (emphasis by the state).

The Supreme Court rejected each of those arguments. After first explaining that it was improper for the state to suggest *at any point* in the trial, including *voir dire*, that the rules of evidence prevented it from presenting all of its evidence, the court addressed the state's argument that the prosecutor had not suggested the existence of incriminating evidence. The court explained that, "because the state is the plaintiff in a criminal case, a prosecutor's suggestion that the state has more evidence than it can present will likely be understood as a suggestion that the state has more *incriminating* evidence than it can present," even if the prosecutor does not say as much. *Id.* (emphasis in original).

The court then turned to the state's contention that the prosecutor's reference to facts not in evidence was remedied by the prosecutor also telling the jury not to speculate.

The court explained that a prosecutor's suggestion that the state has more evidence than it can present is an open invitation to speculate, and that following that invitation by telling the jury not to speculate is "at best, inconsistent" and akin to telling the jury "'not to think of a white bear.'" *Id*. at 588. "Moreover," the court explained, by later telling the jury to focus on the "'facts that are presented,'" the prosecutor could have "caused jurors to believe that they were not to think about the missing video at all"—which would have been incorrect "because jurors can draw reasonable inferences from a party's failure to present evidence '[w]hen it would be natural under the circumstances'" for the party to present that evidence. *Id*. at 589.

The Supreme Court then addressed the question of prejudice. The court observed that references to facts outside the record can be prejudicial in two ways: First, they encourage the jury to speculate about evidence beyond that presented at trial; and, second, they "provide[] a preemptive explanation for the state's failure to present evidence that the jury might expect it to present." *Id*. at 590. That prejudice in that case was significant, the court explained, because the absence of the video of harassment was a central issue, the prosecutor's statements created a risk that the jury might think that the state had the video but was unable to offer it, and "[t]he statements also created a risk that jurors would believe that they could not take the state's failure to present the video into account, which would undercut part of defendant's defense." *Id*.

The court also addressed three arguments advanced by the state as to why the prosecutor's statements did not prejudice the defendant, one of which is especially pertinent to this case: that the statements were harmless because the trial court gave the jury standard instructions regarding how to make its factual findings. In rejecting that argument, the court explained that "[t]he instructions did not tell the jury to disregard the prosecutor's statements," nor "counter the prosecutor's suggestion that the state had evidence that had been excluded because of the rules of evidence, a suggestion that undercut part of defendant's defense." *Id*. at 592. Moreover, the instructions stated that anything that was not in evidence, which would include any video of the

alleged harassment, was unreliable. *Id.* Relying on *Cler v. Providence Health System-Oregon*, 349 Or 481, 490, 245 P3d 642 (2010), the court reiterated the view that Oregon's Evidence Code "deters the suggestion of inadmissible evidence to the jury by any means, including through counsel's statements, and does not somehow authorize that sort of conduct if the trial court gives the jury standard instructions." *Banks*, 367 Or at 592 (internal quotation marks omitted).

On reconsideration in light of *Banks*, we conclude, as Judge James had argued in a dissent to our decision in *Camirand I*, that our discussion of harmless error did not fully account for the harm that occurred in this case when the prosecutor referred to facts outside the record. We focused on the fact that "[t]he prosecutor fully acknowledged that the substance on the gloves had not been tested, and nothing in his argument suggested what the outcome of such tests might be"—in other words, that the prosecutor did not improperly introduce evidence about what the testing would have revealed but "*why* such testing had not occurred." 303 Or App at 10 (emphasis in original). And we then underestimated the harm from that statement about why the testing had not happened based on the court's repeated instructions to the jury that it was to decide the case based on its own recollection of the evidence in the record. *Id.* at 11.

As *Banks* makes clear, that approach was flawed in two ways. First, we did not sufficiently account for the fact that the prosecutor's rebuttal addressed a potential weakness in the state's case—specifically, as in *Banks*, it provided an "explanation for the state's failure to present evidence that the jury might expect it to present." 367 Or at 590. That is, our approach did not recognize how the prosecutor's argument based on facts outside the record undercut defendant's permissible, and potentially powerful, line of defense. Under *Banks*, that type of harm—undercutting a defense argument about the state's proof using facts not in evidence—is significant.

Second, and relatedly, we overestimated the curative effect of the trial court's general instructions to the jury to follow the evidence. Under *Banks*, not only do such generic instructions fail to "tell the jury to disregard the prosecutor's

statements," *id.* and leave them trying "'not to think of a white bear,'" *id.* at 588, they can exacerbate the harm in a case like this, where the state is seeking to diffuse an adverse inference about why it failed to produce certain evidence. In this circumstance, instructions directing the jury to look only at the evidence can, as *Banks* stated, "create[] a risk that jurors would believe that they could not take the state's failure to present the [evidence] into account, which would undercut part of defendant's defense." *Id.* at 590.

Having reconsidered under *Banks* the nature of the prosecutorial misconduct in this case and the trial court's response, we conclude that the prosecutor's improper argument had some likelihood of affecting the jury's verdict and, therefore, the court's error in overruling defendant's objection to it was not harmless. The presence of blood on the gloves was, as we said in *Camirand I*, "a fact of consequence in the case and part of the prosecutor's 'central' theme," 303 Or App at 10, and the prosecutor's explanation for why the state did not produce DNA evidence had some likelihood of affecting the jury's deliberation about the substance on the gloves and, consequently, some likelihood of affecting its determination of defendant's guilt. We therefore reverse and remand.

Reversed and remanded.